RECEIVED

MAY 2 3 2017

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **MICHAEL ASHFORD** | **CIVIL ACTION NO. 2:14 -CV-00992** |
| **v.** | |
| **AEROFRAME SERVICES LLC, ET AL.** | **JUDGE TRIMBLE** |
| | **MAGISTRATE JUDGE KAY** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM RULING**</u>

Before the court is a Motion for Summary Judgment (R. # 110) filed by the defendant, Aviation Technical Services, Inc. (ATS). ATS moves for the court to dismiss all claims and cross claims filed by the realigned plaintiffs—Michael Ashford ("employee-plaintiff"), Aeroframe Services, LLC (Aeroframe), and Roger Porter (collectively "the plaintiffs"). The plaintiffs all request oral arguments on the motion in their oppositions (R. # 120, 122, 123). ATS argues that the plaintiffs have no evidence to establish a *prima facie* case and to bear their ultimate burden of proof for the following claims: (1) Louisiana Civil Code article 2315, (2) breach of contract, (3) intentional interference with contractual relations, (4) tortious interference with business relations, and (5) unfair or deceptive trade practices.[1] For the following reasons, the court agrees and will **GRANT** ATS's Motion for Summary Judgment (R. # 110), **DISMISS** all claims against ATS with prejudice and **DENY** the plaintiffs' request for oral arguments as moot.

## I.   <u>FACTS & PROCEDURAL HISTORY</u>

Prior to August 2013, Aeroframe repaired and maintained airplanes, conducting its business out of a leased hangar space at the Chennault International Airport ("Chennault

---

[1] Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA), La. Rev. Stat. § 51:1401 *et seq.*

Airport"). In 2012, Aeroframe began looking for a business partner-purchaser because of financial difficulties.[2] Aeroframe sought a business partner-purchaser that could settle a defaulted $9 million note acquired through EADS[3] and secured by Aeroframe's equipment (hereinafter the "EADS notes").[4] In November 2012, ATS expressed interest in a possible partnership with Aeroframe, and the two parties entered a nondisclosure agreement (NDA) entitled "Confidentiality Agreement" (the "November NDA").[5] Under the November NDA, ATS had access to Aeroframe's confidential information to conduct due diligence, and as part of the agreement, ATS and Aeroframe agreed to use all confidential information, including financial information, only "for the purpose of a discussion concerning partnership in aircraft maintenance repair and overhaul services."[6] The partner-purchaser negotiations fell through, and in February 2013, Aeroframe contacted ATS offering to sell the company.[7] ATS and Aeroframe began negotiations regarding the sale of Aeroframe in late April 2013.[8] Porter, the chief executive officer (CEO) of Aeroframe, was the primary negotiator for Aeroframe, and he also represented his personal interests in the negotiations, attempting to secure employment with ATS.[9]

As the parties began negotiations in spring 2013, they entered another nondisclosure agreement, entitled "Confidentiality Agreement" (the "May NDA").[10] Under the May NDA,

---

[2] Declaration of Porter (R. # 122-3), p. 1, ¶ 2.

[3] Matra Aerospace, Inc. is EADS's successor-in-interest. Note Purchase Agreement (R. # 110-3), p. 14. For the purposes of clarity, the court will refer to the owner of the EADS note as "EADS." In their memoranda and evidence, the parties also refer to the owner as "Matra."

[4] Declaration of Porter (R. # 122-3), p. 1, ¶ 6.

[5] November NDA (R. # 110-3), pp. 10-12.

[6] *Id.* at p. 10.

[7] Email from Vice President of Aeroframe (R. # 110-2), p. 12.

[8] Email from COO of ATS (R. # 110-2), p. 16; Email from COO of ATS (R. # 110-3), pp. 2-3.

[9] Declaration of Cook (R. # 110-8), p. 3, ¶¶ 16-17.

[10] May NDA (R. # 122-7), pp. 48-51.

2

Aeroframe and ATS agreed that this NDA was the "entire agreement of the parties in respect to the subject matter hereof," i.e. confidential information, and that Aeroframe was not to disclose confidential information or use confidential information for any purpose beyond the parties' potential business relationship.[11] Under the May NDA, ATS had no obligations in regard to confidential information it received from Aeroframe.[12]

The parties entered into an Exclusivity Agreement on June 7, 2013.[13] Under the terms of the agreement, Aeroframe agreed not to negotiate with other potential buyers or disclose non-public information "[f]or the period ATS and Aeroframe and their respective representatives [were] continuing to discuss a Proposed Transaction, but in no event prior to 30 days from the date of [the Exclusivity Agreement's] execution."[14] The Exclusivity Agreement references a previously entered nondisclosure agreement and notes that the nondisclosure agreement will remain in effect after the Exclusivity Agreement expires.[15] The agreement does not clarify whether the previously entered nondisclosure agreement is the November NDA or the May NDA.[16]

The parties did not reach an agreement within 30 days of the execution of the Exclusivity Agreement, and all three plaintiffs contend that the Exclusivity Agreement expired on July 7, 2013.[17] However, ATS maintains that because Aeroframe and ATS continued to engage in active

---

[11] *Id.* at pp. 48, 50, ¶¶ 2, 13.

[12] *See generally id.* at pp. 48-51.

[13] Exclusivity Agreement (R. # 110-3), pp. 61-62.

[14] *Id.* at pp. 61, ¶ B.

[15] *Id.* at pp. 61-62.

[16] *Id.*

[17] *See* Ashford's Memo. in Opposition (R. # 120), pp. 3-4; Declaration of Porter (R. # 122-3), p. 2, ¶ 11; Aeroframe's Memo. in Opposition (R. # 123), p. 6.

negotiations, the Exclusivity Agreement remained in place through August.[18] While negotiating

with ATS in July, Porter began negotiations on behalf of Aeroframe with ATS's competitor,

AAR.[19]

The main terms of Aeroframe and ATS's sale negotiation included (1) the settlement or

purchase of the EADS note, (2) ATS securing a ground lease at the Chennault Airport, and (3)

Porter securing employment with ATS.[20] The parties disagree about whether Aeroframe ever

agreed to ATS *purchasing* the EADS debt even though all three plaintiffs contend that the terms

of the agreement were contingent on the *settlement* of the EADS note and other outstanding

debt.[21] The plaintiffs support this contention with an email sent between ATS and Aeroframe on

June 23, 2013, that lists "[a]pprox[imately] $1.1M cash for settlement of EADS debt" as one of

the proposed terms to allow ATS to purchase Aeroframe's assets.[22] However, an email from

Porter to ATS's corporate officers on June 28 states that "the LOI [letter of intent] could just

state successful purchase of EADS note."[23] The plaintiffs also rely on a letter of intent from the

other potential buyer, AAR, as evidence that Aeroframe only wanted the debt settled, not

---

[18] Memo. in Support (R. # 110-1), p. 14 n.28.

[19] Declaration of Porter (R. # 122-3), p.2, ¶¶ 13-15. The parties have not provided evidence of the exact date that negotiations with AAR commenced, but Porter maintains in his sworn declaration that it was after July 7, 2013. *Id.* at p. 2, ¶ 13.

[20] *See* Declaration of Porter (R. # 122-3), pp. 1-2; Declaration of Cook (R. # 110-2), p. 3. ATS maintains that the sale was predicated on the *purchase* of the EADS note, *see* Declaration of Cook (R. # 110-2), p. 3, ¶ 18, while Porter and Aeroframe maintain that the sale was predicated on the *settlement* of the EADS note, *see* Declaration of Porter (R. # 122-3), p. 1, ¶ 6.

[21] Porter's Memo. in Opposition (R. # 122), pp. 7-8; Aeroframe's Memo. in Opposition (R. # 123), p. 5.

[22] Email from COO of ATS (R. # 122-7), p. 66.

[23] Adams v. Aeroframe Services, LLC, 2:14-cv-00984-JTT-KK, Email from Porter (R. # 40-3), p. 26. For some unknown reason, Aeroframe did not attach the relevant exhibits to its response to the Motion for Summary Judgment in this particular case.

purchased because the letter of intent lists "[n]egotiation of the extinguishment of existing EADS debt…for $1.25 million" as a condition of the parties' agreement.[24]

ATS argues that the parties agreed that ATS would acquire Aeroframe's assets by purchasing the EADS debt and then foreclosing on the securitized assets.[25] ATS relies on the deposition of its chief financial officer (CFO) and an email from Aeroframe's counsel that directed ATS to contact EADS directly.[26] Based on the testimony of the CFO, ATS wanted to purchase Aeroframe's assets, and to own the assets lien-free, it needed to purchase the EADS note and then foreclose on the securitized assets.[27] The CFO recounted that in early July, Porter asked ATS to loan Aeroframe money so that Aeroframe could buy the note.[28] ATS declined, and Porter responded that ATS would need to contact EADS to buy the note.[29] According to the CFO, after this conversation with Porter, Aeroframe's attorney put ATS in contact with the owner of the note.[30] ATS also argues, that AAR's letter of intent outlined the same asset purchase proposal—buying the EADS note and foreclosing on it.[31]

The court is puzzled by the plaintiffs' attempt to distinguish between the settlement and purchase of the debt. The semantic distinction that the plaintiffs highlight is a distinction without a difference. One method of settling the EADS debt would be to purchase the debt from EADS. In his declaration, Porter maintains that Aeroframe did not "agree to allow ATS to purchase the

---

[24] AAR Letter of Intent (R. # 122-9), p. 6.

[25] Reply to Aeroframe and Porter (R. # 129), p. 25.

[26] *See* Deposition of Cook (R. # 120-5); Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[27] Deposition of Cook (R. # 120-5), pp. 18, 41, 61.

[28] *Id.* at pp. 21-22.

[29] *Id.* at p. 22.

[30] *Id.* at p. 23. *See also* Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[31] Reply to Aeroframe and Porter (R. # 129), pp. 26-27.

EADs note [because] the key to any deal was to eliminate the EAD's [sic] debt as part of an acquisition."[32] Yet, none of the plaintiffs offer evidence of another agreed upon method of settling or eliminating the debt. The only evidence provided supports ATS's interpretation of how the debt was to be settled, by purchasing the note from EADS, especially considering that Aeroframe put ATS into direct contact with EADS,[33] ATS rejected Aeroframe's request to borrow the money to pay EADS on the defaulted loan, and Aeroframe has failed to offer the court any other viable method of settling the debt.

In addition to discussing terms of the purchase agreement in July, the parties continued to discuss a potential employment agreement between Porter and ATS. On July 11, 2013, ATS offered Porter employment under a proposed consulting agreement.[34] Porter rejected the first consulting agreement on July 15,[35] and ATS sent him a revised consulting agreement on July 17.[36] In the same email that contained the revised employment agreement, ATS stated that it had learned that Aeroframe was in discussions with another buyer, and it needed to know what Porter was thinking.[37] At some point between July 17 and July 19, Porter rejected the revised consulting agreement.[38]

On July 19, AAR, ATS's competitor with which Porter was in simultaneous negotiations, sent Aeroframe a letter of intent that outlined the conditions of a possible AAR purchase and

---

[32] Declaration of Porter (R. 122-3), p. 2, ¶ 8.

[33] *See generally* Deposition of Cook (R. 120-5); Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[34] Email from COO of ATS (R. # 110-4), p. 24.

[35] Email from Porter, with attached consulting agreement (R. # 122-8), pp. 10-17.

[36] Email Chain between COO of ATS and Porter (R. #122-8), pp. 18-26.

[37] *Id.*

[38] *See* Email Chain between CEO of ATS and Porter (R. # 110-4), p. 47-48.

included a 30-day period in which Porter agreed to negotiate exclusively with AAR.[39] As part of the letter of intent, AAR would attempt to extinguish the EADS note for $1.25 million and Porter would be offered an employment contract with AAR.[40] Porter signed the letter of intent and agreed to the exclusivity period on either July 19 or 20.[41] On July 19, Porter informed a corporate officer at ATS that he had started a dialog with another company that day.[42] Later that evening, the CEO of ATS emailed Porter to set up a phone call, and Porter agreed to talk.[43] On July 20, the CEO of ATS and Porter continued to converse about ATS's possible purchase of Aeroframe and offer of employment to Porter.[44] The CEO sent Porter an outline of a new employment agreement that night.[45]

The chief operating officer (COO) of ATS also maintained contact with Porter. On July 22, after Porter would not respond directly to his inquiries, the COO asked Porter whether he was in an exclusive agreement, and Porter responded that he was.[46] Then, the COO invited Porter to go golfing with him the next weekend, and Porter accepted.[47] On July 26, ATS retracted its employment offer, while stating that it hoped to find an agreeable solution with Porter at a later

---

[39] AAR Letter of Intent (R. # 110-5), pp. 14-16.

[40] *Id.*

[41] *Id.* The parties have not provided evidence of the exact date that the letter was signed. While Aeroframe claims that the letter was signed on July 20, Memo. in Opposition (R. # 123), p. 4, the evidence cited to support this contention does not provide a date on which the agreement was signed.

[42] Text Exchange (R. # 122-7), p. 79.

[43] Email Chain between CEO of ATS and Porter (R. # 110-4), pp. 47-48.

[44] *Id.* at pp. 47-49.

[45] *Id.* at p. 49.

[46] Text Exchange (R. # 122-7), p. 80.

[47] *Id.*

date.[48] On July 27,[49] Porter and the COO went golfing, and during the golf game, Porter confirmed that the potential buyer was AAR.[50]

During this same time frame, ATS was able to reach a purchase agreement with the owner of the EADS note. On Friday, July 12, Aeroframe's attorney emailed ATS's CFO informing ATS that it could directly negotiate with the owner of the EADS note,[51] and ATS's CFO directly contacted the owner's legal counsel that same day.[52] The CFO of ATS was then put in contact with a "decision-maker" at EADS who would be able to approve the purchase of the loan.[53] The following Monday, July 15,[54] ATS's CFO learned from the decision-maker at EADS that the owner of the note was asking $1.5 million as a purchase price, and that if the note was not purchased soon, it would be placed on the open market.[55] During the week of July 15, the owner of the note had ATS sign a nondisclosure agreement,[56] and ATS and EADS continued negotiations on the purchase price of the note. ATS initially offered $1.1 million, and EADS remained firm on $1.5 million, noting that it would take the note to the open market.[57] EADS then reached out to ATS on Saturday, July 20 and offered to sell the note for $1.4 million.[58] The

---

[48] Email from CEO of ATS (R. # 122-8), p. 28.

[49] Text Exchange (R. # 122-7), p. 81.

[50] Deposition of Burnside (R. # 122-6), p. 31.

[51] Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[52] Deposition of Cook (R. # 120-5), pp. 24-25.

[53] Id. at p. 25.

[54] Id. at pp. 29-30.

[55] Id. at pp. 26-27.

[56] Id. at p. 34.

[57] Id. at pp. 36-38.

[58] Id. at pp. 39-40, 52.

parties were then able to agree on a purchase price of $1.375 million, which they confirmed via email on Tuesday, July 23.[59]

All three plaintiffs contend that ATS's purchase of the note was a malicious attempt to thwart AAR's attempted purchase of Aeroframe.[60] As support for this contention, Aeroframe points out that $1.375 million was the exact mid-point between AAR's July 19 letter of intent offer and the EADS demand.[61] Porter and Aeroframe also cite the deposition of ATS's CFO in which he states that after negotiating the purchase price of the loan that ATS secured local counsel to foreclose on the loan.[62] The plaintiffs argue that this is evidence that instead of attempting to deal with Porter and Aeroframe, ATS was attempting to sabotage Aeroframe.[63] The entire excerpt of the deposition suggests that the foreclosure process was a tool that would allow ATS to own Aeroframe's assets lien-free.[64] The plaintiff-employee cites deposition testimony from ATS officers that ATS considered the loan worthless without the lease, as evidence that ATS did not buy the note for business reasons.[65]

On July 30, one week after EADS and ATS had a written confirmation of their agreement, ATS finalized the purchase of the EADS note and informed Aeroframe, Porter, and AAR of the purchase.[66] The next day both ATS and AAR informed the Chennault Airport of their intent to secure Aeroframe's hangar lease to run an airplane maintenance and repair

---

[59] Deposition of Cook (R. # 120-5), pp. 40-41; Email from CFO of ATS (R. # 122-8), p. 27.

[60] Ashford's Memo. in Opposition (R. # 120), pp. 5-6; Porter's Memo. in Opposition (R. # 122), pp. 10-12; Aeroframe's Memo. in Opposition (R. #123), p. 11.

[61] Aeroframe's Memo. in Opposition (R. # 123), p. 8.

[62] *See* Porter's Memo. in Opposition (R. # 122), pp. 10-11; Aeroframe's Memo. in Opposition (R. # 123), p. 8.

[63] *See* Porter's Memo. in Opposition (R. # 122), pp. 10-11.

[64] *See* Deposition of Cook (R. # 120-5), p. 61.

[65] Ashford's Memo. in Opposition (R. # 120), pp. 5-6 (citing Deposition of Cook (R. # 120-5); Deposition of Burnside (R. # 120-4)).

[66] Note Purchase Agreement (R. # 110-3), pp. 14-48; Deposition of Burnside (R. # 121), pp. 190-91.

operation out of Lake Charles.[67] AAR visited the airport with Porter and told Porter that it was still interested in working out an employment agreement.[68]

On July 31, ATS made a conditional offer of employment to Porter, and Porter accepted it that same day.[69] On the morning of August 1, 2013, ATS's COO texted Porter, asking him to keep the company in the loop in regard to communications with AAR.[70] Porter responded, "Okay will do. I give you my word that I am on the ATS team and will keep you in the loop."[71]

During the evening of August 1, while representing to ATS that he was having dinner with the executive director of the Chennault Airport,[72] Porter had dinner with AAR executives and signed an employment agreement with AAR conditioned on AAR securing the Chennault Airport hangar lease.[73] After the dinner, Porter continued to represent to ATS that he would help it secure the hangar lease.[74] However, on Saturday, August 3, Aeroframe, through Porter, voluntarily surrendered the lease, and at Porter's request, the Chennault Airport awarded the hangar lease to AAR.[75] The following day, Porter emailed ATS informing the company that AAR had secured the lease and wanted all Aeroframe assets removed from the hangar over the next two weeks.[76]

---

[67] *See* Declaration of Avery (R. # 110-7), pp. 21-22, ¶ 4; Email from COO of ATS (R. # 122-8), p. 34.

[68] Affidavit of Porter (R. # 110-6), pp. 28-29, ¶ 9.

[69] Position Offer Letter (R. # 110-6), pp. 38-40. The employment offer was conditioned on signing a confidentiality agreement and a drug screening. *Id.* at p. 39. Porter never received the confidentiality agreement and never signed it. Declaration of Porter (R. # 122-3), p. 3, ¶ 25. ATS never actually hired Porter. Deposition of Burnside. (R. # 121), p. 200.

[70] Text Exchange (R. # 122-7), p. 83.

[71] *Id.*

[72] *Id.* at p. 84.

[73] Affidavit of Porter (R. # 110-6), p. 29, ¶ 10; AAR Offer of Employment (R. # 110-6), pp. 41-42.

[74] *See* Text Exchange (R. # 122-7), p. 84.

[75] Affidavit of Porter (R. # 110-6), p. 30, ¶ 12.

[76] Email from Porter (R. # 110-7), p. 12.

On Monday, August 5, AAR and Aeroframe entered an agreement under which Aeroframe would vacate the premises and remove all equipment from the hangar by August 31, 2013.[77] On August 6, ATS sent a letter to Aeroframe demanding the amount past due on the EADS note and giving the company five days to cure the default.[78] On August 9, Porter decided to cease business operations at Aeroframe Services and sent Aeroframe's employees away without pay.[79] Porter made this decision because a customer refused to pay an outstanding bill, which resulted in Aeroframe not having funds to make payroll[80] and because of the imminent foreclosure on Aeroframe's equipment by ATS.[81] The plaintiffs argue that this situation was caused by ATS purchasing the EADS note and AAR subsequently deciding not to purchase Aeroframe.[82]

On August 14, AAR sent Aeroframe and ATS a letter informing them that they must immediately make arrangements to remove property located at the Chennault Airport hangar.[83] On August 15, after Aeroframe did not cure the default on the EADS note, ATS sent another demand letter, informing Aeroframe that the debt was accelerated and the entire amount was immediately due.[84] On August 20, ATS and Aeroframe signed a strict foreclosure agreement under which Aeroframe

---

[77] Affidavit of Porter (R. # 110-6), p. 31, ¶ 13.

[78] Demand Letter (R. # 110-7), pp. 2-3.

[79] Porter's Interrogatory Responses (R. # 110-5), pp. 29-30.

[80] Porter's Interrogatory Responses (R. # 110-5), pp. 29-30. Porter explains that he made the decision to cease operations after AAR refused to assist Aeroframe collect past due amounts from customers and told an Aeroframe customer that AAR would perform work on the customer's airplanes regardless of whether it paid Aeroframe. Affidavit of Porter (R. # 110-6), p. 32, ¶ 15.

[81] Declaration of Porter (R. # 122-3), p. 4, ¶ 32.

[82] Ashford's Memo. in Opposition (R. # 120), p. 7; Declaration of Porter (R. # 122-3), p. 4, ¶ 32; Aeroframe's Statement of Material Facts (R. #123-1), p. 3, ¶ 24.

[83] Letter from AAR (R. # 110-7), pp. 5-7.

[84] Acceleration Demand Letter (R. #110-7), pp. 9-10.

> irrevocably and unconditionally release[d] and forever discharge[d] ATS...from any and all rights, claims, remedies, and causes of action relating to the Note, Security Agreement, and Note Purchase Agreement, and the transfer of the Transferred Collateral under this Agreement,...(the "Released Claims") [and] covenant[ed] not to sue [ATS] on account of any Released Claims.[85]

Under the agreement, Aeroframe transferred all of its ownership rights to its equipment and fixed assets to ATS for partial satisfaction of the EADS note.[86] Aeroframe argues that the agreement was entered into under duress because unless the agreement was signed, ATS would have foreclosed on all of Aeroframe's assets.[87]

Subsequently, Porter was not employed by AAR, and he filed suit against AAR in the Western District of Tennessee for breaching the conditional employment agreement.[88] Discovery in this litigation revealed that AAR refused to employ Porter because he failed to pay his employees and blamed his failure on his customers.[89] AAR determined that it would not engage Porter "until he fully wrapped up with his obligations with Aeroframe."[90] In the litigation before this court, Porter argues that AAR did not employ him because ATS bought the EADS note in violation of Louisiana law.[91] The timeline of events as described above is undisputed by the parties, and it is supported by the submitted evidence.

---

[85] Strict Foreclosure Agreement (R. # 110-3), pp. 54-55, ¶ 8.

[86] Strict Foreclosure Agreement (R. # 110-3), p. 51, ¶¶ H-I.

[87] Aeroframe's Memo. in Opposition (R. # 123), p. 16. Under the strict foreclosure agreement, Aeroframe was able to retain ownership over "cash, trade receivables, other receivables, prepaids, work in process, other assets or deposits in favor of Aeroframe, [and] customer deposits...other than the Transferred Collateral." Strict Foreclosure Agreement (R. # 110-3), p. 51, ¶ I.

[88] *See* Porter v. AAR Aircraft Services, Inc., 2:15-cv-02780-JTF-tmp (W.D. Tenn.). This suit is still active.

[89] Email from AAR (R. # 110-7), p. 24.

[90] *Id.*

[91] Porter's Memo. in Opposition (R. # 122), pp. 5-6.

In October 2013, the plaintiff-employee filed suit against Aeroframe in state court alleging that his former employer was liable under Louisiana's Last Paycheck Law.[92] The plaintiff-employee also filed suit against ATS, alleging that ATS is liable for his unpaid wages under Louisiana Civil Code article 2315, under the tort of interference with contract, and under LUTPA, La. Rev. Stat. § 51:1401, *et seq.*[93] ATS brought a cross-claim against Aeroframe and a third party demand against Porter, alleging that Aeroframe and Porter are liable for damages and expenses incurred by ATS when it purchased the EADS note, that Aeroframe and Porter are liable through contribution or indemnity for any liability that ATS faces from the employee-plaintiffs, and that Aeroframe and Porter are liable under a theory of unjust enrichment.[94] Porter brought cross-claims against ATS, alleging that ATS is liable for his damages under theories of intentional interference with contractual relations, tortious interference with business relations, and unfair trade practices under LUTPA.[95] Aeroframe also brought cross-claims against ATS for breach of contract, intentional interference with contractual relations, tortious interference with business relations, and unfair trade practices under LUTPA.[96]

Later, ATS learned that the same law firm that represented the plaintiff-employee was representing Porter, pursuant to a waiver agreement which stated that the plaintiff-employee's claims against Aeroframe were resolved.[97] ATS removed the matter, and after a lengthy motion to remand, this court determined that it had diversity jurisdiction.[98] While the plaintiffs raise this

---

[92] Compl. (R. # 1-1), pp. 4-8.

[93] *Id.*

[94] ATS's Cross-Claim and Third Party Demand (R. # 1-1), pp. 41-53.

[95] Porter's Cross-Claim (R. # 1-1), pp. 105-10.

[96] Aeroframe's Answer and Cross-Claim (R. #1-1), pp. 116-28.

[97] *See* Magistrate Judge's Memo. Ruling (R. # 60), *affirmed by* Order (R. # 76).

[98] *See id.*

issue yet again, the court will not re-address it in this ruling.[99] The court has already determined that it has subject matter jurisdiction over the case.

ATS moved for summary judgment and dismissal of all claims against it brought by the plaintiff-employee, Aeroframe, and Porter. All three plaintiff-parties oppose the Motion for Summary Judgment, arguing that the timeline presents questions of material fact as to whether ATS is liable for their damages.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[100] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[101] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[102] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim.[103] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[104]

This burden requires more than mere allegations or denials of the adverse party's pleadings. To establish that there is a genuine issue of material fact for trial, the party "must

---

[99] Ashford's Memo. in Opposition (R. # 120), p. 9; Porter's Memo. in Opposition (R. # 122), p. 16; Aeroframe's Memo. in Opposition (R. # 123), p. 16.

[100] Fed. R. Civ. P. 56(a).

[101] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[102] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir.1999).

[103] Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

[104] *Id.*

14

support the assertion by…citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[105] In the absence of proof, the court will not "assume that the nonmoving party could or would prove the necessary facts."[106] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[107] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[108] Additionally, if the non-moving party does not dispute the facts listed by the moving party, the court may accept those facts as true.[109]

## III.    LAW AND ANALYSIS

ATS argues that there is no genuine issue of material fact, and that none of the plaintiffs' claims are supported by evidence. First, ATS argues that the plaintiff-employee cannot bring claims under Louisiana Civil Code article 2315 or the tort of intentional interference with contractual relations because the plaintiff-employee did not provide evidence to support those claims in his response to the Motion for Summary Judgment and because ATS did not owe him a duty. ATS also argues that the plaintiff-employee cannot bring claims under LUTPA because he does not have standing to do so, he has not provided evidence of unfair trade practices, and he has not provided evidence of causation.

---

[105] Fed. R. Civ. P. 56(c)(1)(A); *see Celotex Corp.*, 477 U.S. at 324.

[106] *Little*, 37 F.3d at 1075 (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)) (emphasis removed).

[107] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

[108] *Anderson*, 477 U.S. at 249–50 (citations omitted).

[109] Eversley v. MBank Dallas, 843 F.2d 172, 174 (5th Cir. 1988) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Anderson*, 477 U.S. at 249; *Celotex Corp.*, 477 U.S. at 324).

Second, ATS argues that Aeroframe waived all of its claims when it signed the strict foreclosure agreement with ATS. Additionally, even if the claims were not waived, ATS argues that Aeroframe has failed to provide evidence of causation for any of the claims, evidence of a contract that was breached, evidence that ATS intentionally sabotaged Aeroframe, and evidence of unfair trade practices.

Finally, ATS argues that Porter's claims fail because he also provides no evidence of causation for any of his claims. And even if he could provide evidence of causation, he has not provided evidence of actual malice for his alleged tortious interference with contractual relations, that ATS intentionally interfered with his dealings with AAR, or that ATS engaged in unfair trade practices.

## A. Plaintiff-Employee's Claims Against ATS

The plaintiff-employee alleges that ATS violated Louisiana Civil Code article 2315 and LUTPA, and that ATS tortiously interfered with the contract between Aeroframe and ATS by purchasing and foreclosing on the EADS note without Aeroframe's permission. The plaintiff-employee alleges that these actions caused Aeroframe to close without paying him his final paychecks. All of these claims fail under the standards for summary judgment.

### 1. Louisiana Civil Code Article 2315

The plaintiff-employee first alleges that in violation of Louisiana Civil Code article 2315, ATS caused the plaintiff-employee's damages by improperly using confidential financial information and "retaliating against Aeroframe by accelerating large amounts of debt so quickly that Aeroframe was forced to shut down without paying its employees."[110] Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it

---

[110] Petition (R. # 1-1), p. 6, ¶ 16.

happened to repair it."[111] Under Article 2315, "fault" encompasses more than negligence; "[i]t is the breach of a duty owed by one party to another under particular circumstances of a given case."[112] ATS argues that the plaintiff-employee is unable to establish that ATS owed a duty to him, and even if ATS breached a duty owed to the plaintiff-employee, the evidence does not establish that the ATS purchase of the EADS note caused the plaintiff-employee to not receive pay.[113] None of the agreements between Aeroframe and ATS included provisions about Aeroframe's employees, and therefore, ATS argues that it did not owe a duty to the plaintiff-employee.[114] To support its contention that ATS's actions did not cause the plaintiff-employee harm, ATS points to Porter's answers to interrogatories in which he stated that he decided to cease Aeroframe's operations because a customer refused to pay a past due bill and he could not get a loan for payroll.[115] ATS has met the initial burden of showing an absence of evidence supporting the plaintiff-employee's claims, and so the burden has shifted to the plaintiff-employee to provide evidence of a genuine issue of material fact that would allow a reasonable jury to find in favor of him.[116]

The plaintiff-employee fails to do so. The plaintiff-employee does not specify under what theory of fault he is bringing his Article 2315 claims, and he does not address what evidence supports the claim in his response to ATS's Motion for Summary Judgment.[117] In fact, the

---

[111] La. Civ. Code art. 2315.

[112] Rosado v. Deters, 5 F.3d 119, 123–24 (5th Cir. 1993) (citing Williams v. Louisiana Mach. Co., Inc., 387 So.2d 8, 11 (La. App. 3d Cir. 1980)).

[113] Memo. in Support (R. # 110-1), pp. 33-34.

[114] *See* Exclusivity Agreement (R. # 110-3), pp. 61-62; May NDA (R. # 122-7), pp. 48-51; November NDA (R. # 110-3), pp. 10-12.

[115] Porter's Interrogatory Responses (R. # 110-5), pp. 29-30.

[116] *See Little*, 37 F.3d at 1075.

[117] Ashford's Memo. in Opposition (R. # 120).

plaintiff-employee does not even mention Article 2315 in his opposition memorandum.[118] Because the plaintiff-employee has not presented evidence to support his Article 2315 claims and/or to create a genuine issue of material fact for trial, the Article 2315 claims will be dismissed with prejudice.[119]

## 2. Intentional Interference with Contractual Relations

Next, the plaintiff-employee alleges that ATS, a corporate entity, intentionally interfered with the contract between AAR and Aeroframe and the contract between the plaintiff-employee and Aeroframe.[120] Arising out of Louisiana Civil Code article 2315, Louisiana recognizes the tort of intentional interference with contractual relations when a corporate officer intentionally and unjustifiably interferes with a contractual relation between his employer and the plaintiff.[121] To bring a successful claim, the plaintiff must provide evidence of:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.[122]

When the Louisiana Supreme Court in *9 to 5 Fashions, Inc. v. Spurney* recognized this tort, it recognized that the cause of action was limited, and it has not revisited the scope of the action since *9 to 5*.[123] In applying *9 to 5*, the Fifth Circuit has been cautious against expanding

---

[118] *Id.*

[119] *See Little*, 37 F.3d at 1075.

[120] Petition (R. # 1-1), pp. 6-7, ¶ 16.

[121] 9 to 5 Fashions, Inc. v. Spurney, 538 So. 2d 228, 234 (La. 1989).

[122] *Id.*

[123] Petrohawk Props., L.P. v. Chesapeake La., L.P., 689 F.3d 380, 395 (5th Cir. 2012) (citing *9 to 5*, 538 So. 2d at 234 and other Fifth Circuit decisions applying *9 to 5*).

the tort beyond the limits described by the Louisiana Supreme Court.[124] While Louisiana appellate courts are split on whether a cause of action can be brought against a corporate entity,[125] federal courts applying Louisiana law have made an *Erie*-guess and have determined that a plaintiff cannot bring an intentional interference with contractual relations claim against a corporate entity.[126] Federal courts have come to this conclusion by conservatively interpreting *9 to 5* to prevent federal expansion of Louisiana tort law.[127] Additionally, at least one federal court has reasoned that "a corporate entity [cannot be held] liable through *respondeat superior* for [intentional interference with contractual relations] claims asserted against a corporate officer because, by definition, [this] claim involves conduct beyond the scope of the officer's corporate authority."[128] This court agrees with the *Erie*-guess made by other Louisiana federal courts and finds that Louisiana does not recognize an intentional interference with contractual relations claim against a corporation individually or under a theory of *respondeat superior*. Therefore, because the plaintiff-employee's intentional interference with contract claims are against a corporation, they fail.

This claim would fail even if it could be brought against a corporate entity, because the plaintiff must show that "the defendant owe[d] a duty to the plaintiff in order for the plaintiff to

---

[124] *Id.* (citing *9 to 5*, 538 So. 2d at 234 and other Fifth Circuit decisions applying *9 to 5*).

[125] Tech. Control Sys., Inc. v. Green, 2001-0955, p. 3 (La. App. 3 Cir. 2/27/02), 809 So. 2d 1204, 1207, writ denied, 2002-0962 (La. 5/31/02), 817 So. 2d 100 (declining to extend the tort to allow a cause of action against a corporate entity); Neel v. Citrus Lands of La., Inc., 629 So. 2d 1299, 1301 (La. App. 4 Cir. 1993) (allowing a cause of action against a corporate entity if the entity owed a duty to the plaintiff).

[126] Total Safety v. Rowland, No. CIV.A. 13-6109, 2014 WL 6485641, at *4 (E.D. La. Nov. 18, 2014) (declining to extend the cause of action beyond corporate officers) (citing *Petrohawk Properties, L.P.*, 689 F.3d at 396; Boudreaux v. OS Restaurant Services, *LLC*, No. 14–1169, 2014 WL 4930475 (E.D. La. Sept. 30, 2014); Mountain States Pipe & Supply Co. v. City of New Roads, La., No. 12–2146, 2013 WL 3199724 (E.D. La. June 21, 2013); M & D Mineral Consultants LLC v. Wenting Li, et al., No. 12–2082, 2013 WL 883689 (W.D. La. Mar. 7, 2013)).

[127] *Id.*

[128] Bollinger v. Tanner Companies, LP, No. CIV.A. 02-3248, 2003 WL 1824836, at *2 (E.D. La. Apr. 7, 2003).

have a viable claim for tortious interference with a contract."[129] ATS argues that it did not owe the plaintiff-employee a duty in its business negotiations with Aeroframe, and the plaintiff-employee has not presented evidence to rebut this contention. Also, because the plaintiff-employee was an at-will employee,[130] he cannot state a viable cause of action because "[a]n at-will employee simply has no 'legally protected interest in his employment necessary for a claim for tortious interference with a contract.'"[131]

This tort claim would also fail for lack of evidence establishing causation. ATS provides evidence that its actions did not cause the plaintiff-employee's harm, and the plaintiff-employee does not present evidence to rebut this.[132] The plaintiff-employee does not address the tortious interference with contract claim at all in his response to ATS's Motion for Summary Judgment.[133] The court will dismiss this claim with prejudice because the plaintiff-employee is suing a corporate entity, he has not provided evidence that the corporate entity owed him any duty, he is an at-will employee with no legally protected interest in his employment, and the plaintiff-employee has not provided evidence that ATS's actions caused his damages.

### 3. LUTPA

The final claims raised by the plaintiff-employee are unfair trade practices claims brought under LUTPA. LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts

---

[129] *Petrohawk Props., L.P.*, 689 F.3d at 396.

[130] This fact is included in ATS's Statement of Uncontested Material Facts (R. # 110-9), p. 15, ¶ 75. The plaintiff-employee does not rebut this in their opposition memorandum (R. # 120) or in their Statement of Contested Facts (R. # 120-1). Therefore, the court will consider the fact undisputed and take it as true. *See Eversley*, 843 F.2d at 174.

[131] Favrot v. Favrot, 2010-0986, p. 20 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1111 (quoting Durand v. McGaw, 93–2077, p. 4 (La. App. 4 Cir. 3/29/94), 635 So. 2d 409, 411) (citing Mendonca v. Tidewater Inc., 05–1166 (La. App. 4 Cir. 5/31/06), 933 So. 2d 233).

[132] This evidence includes Porter's answers to interrogatories in which he stated that he decided to cease Aeroframe's operations because a customer refused to pay a past due bill and he could not get a loan for payroll. Porter's Interrogatory Responses (R. # 11-5), pp. 29-30.

[133] Ashford's Memo. in Opposition (R. # 120).

or practices in the conduct of any trade or commerce."[134] "[U]nder this statute, the plaintiff must show the alleged conduct 'offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'"[135] Courts determine what actions are prohibited on a case-by-case basis.[136] However, "the range of prohibited practices is extremely narrow," and only egregious actions that involve fraud, deceit, or misrepresentation are prohibited.[137] The "defendant's motivation is a critical factor—[the defendant's] actions must have been taken with the specific purpose of harming the competition."[138]

However,

> LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious. Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.[139]

To state a viable claim under LUTPA, the plaintiff-employee must establish he suffered an ascertainable loss that was caused by ATS's use of unfair or deceptive acts or practices.[140] If the

---

[134] La. Rev. Stat. § 51:1405.

[135] Cheramie Servs., Inc. v. Shell Deepwater Prod., 09–1633, pp. 10-11 (La.4/23/10), 35 So. 3d 1053, 1059 (quoting Moore v. Goodyear Tire & Rubber Co., 364 So. 2d 630, 633 (La. App. 2 Cir. 1978) (other citations omitted).

[136] Id. 09-1633, p. 10; 35 So. 3d at 1059.

[137] Id. 09-1633, pp. 11-12; 35 So. 3d at 1060.

[138] Monroe v. McDaniel, 16-214, p. 10 (La. App. 5 Cir. 12/7/16), 207 So. 3d 1172, 1180 (citing Creative Risk Controls, Inc. v. Brechtel, 01–1150 (La. App. 5 Cir. 4/29/03); 847 So.2d 20, 24).

[139] Cheramie Servs., Inc., 09-1633, p. 11; 35 So. 3d at 1059 (citing Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir.1993)).

[140] Hurricane Fence Co. v. Jensen Metal Prod., Inc., 12-956, p. 7 (La. App. 5 Cir. 5/23/13), 119 So. 3d 683, 688.

plaintiff is unable to present evidence of a loss, causation, or use of an unfair or deceptive act or practice, the claim may be dismissed on a motion for summary judgment.[141]

The plaintiff-employee asserts that ATS engaged in unfair and deceptive trade practices by breaching the November NDA and purchasing the EADS note without Aeroframe's knowledge.[142] ATS argues that this claim fails on three grounds: (1) the plaintiff-employee lacks standing to base a claim on the November NDA; (2) the plaintiff-employee failed to provide evidence that ATS engaged in unfair or deceptive practices; and (3) that the plaintiff-employee failed to provide evidence that his harm was caused by ATS's actions.

ATS argues that the plaintiff-employee has no standing to base a LUTPA claim on a contract to which he was neither a party nor a third-party beneficiary.[143] ATS cites no law to support this argument. The Louisiana Supreme Court has interpreted standing for LUTPA claims broadly, allowing any person, not just consumers and competitors, to recover for a loss caused by an unfair business practice.[144] Therefore, even though the plaintiff-employee has provided no evidence that he is a party or third-party beneficiary to the contract, the court finds that this does not bar a LUTPA claim, which must be based on more than a mere breach of contract.

ATS also argues the plaintiff-employee's LUTPA claims fail because the evidence shows that ATS engaged in permissible business negotiations with the owner of the EADS note. ATS presents evidence which shows that the May NDA and not the November NDA was in effect

---

[141] *See, e.g.,* Metcalfe & Sons Investments, Inc. v. Multiquip, Inc., No. 3:09-0941, 2011 WL 4527432, at *1 (M.D. La. Sept. 27, 2011) (dismissing LUTPA claims on a motion for summary judgment by determining that the defendants conduct was not egregious enough to support a viable claim); *Creative Risk Controls, Inc.*, 01–1150, p. 10; 847 So.2d at 26 (affirming the dismissal of LUTPA claims on summary judgment when the plaintiffs failed to show that actions were taken with intent to harm the plaintiff).

[142] *See* Ashford's Memo. in Opposition (R. # 120).

[143] *See* ATS's Reply to Ashford (R. # 124).

[144] *Cheramie Servs., Inc.*, 09–1633, pp. 7-8, 35 So. 3d at 1058.

during July.[145] Also, the May NDA imposed no requirements on ATS,[146] and Aeroframe anticipated that ATS would settle the debt by purchasing the note from EADS.[147] To further buttress its position, ATS points out that Aeroframe put ATS directly in contact with EADS and that EADS wanted a buyer quickly.[148] Finally, ATS submits evidence that the negotiated price was not based on AAR's letter of intent.[149] ATS also notes that the plaintiff-employee provided no evidence beyond his conclusory assertions that ATS intended to misrepresent, deceive, or harm Aeroframe or AAR.[150]

Based on the evidence provided, the court agrees with ATS. The language of the May NDA makes it clear that the May NDA was the parties' complete agreement on confidential information.[151] Therefore, as a complete agreement, the May NDA, and not the November NDA, would govern the parties' July purchase negotiations. Furthermore, the May NDA was put in place to cover the exchange of information dealing with the possible purchase of Aeroframe by ATS, while the November NDA covered discussions for a possible partnership.[152] Based on the subject matter of the May NDA and the parties' understanding that the May NDA was their complete agreement, the NDA referred to in the Exclusivity Agreement and the NDA in effect during the July negotiations was the May NDA. The May NDA imposed no requirements on

---

[145] May NDA (R. # 110-3), p. 7, ¶ 13.

[146] *Id.* at pp. 5-8.

[147] *See* Deposition of Cook (R. #120-5), pp. 18-41; Adams v. Aeroframe Services, LLC, 2:14-cv-00984-JTT-KK, Email from Porter (R. # 40-3), p. 26.

[148] *See* Deposition of Cook (R. #120-5), pp. 18-41.

[149] *See id.*

[150] *See* ATS's Reply to Ashford (R. # 124), p. 7 (citing Ashford's Memo. in Opposition (R. # 120), p. 5).

[151] May NDA (R. #110-3), p. 7, ¶ 13.

[152] *Compare* May NDA (R. # 110-3), pp. 6-9, *with* November NDA (R. # 110-3), pp. 10-12.

ATS in regard to confidential financial information.[153] Therefore, even if Aeroframe had not agreed to ATS's communication with EADS, ATS would not have violated the May NDA by doing so.

While the evidence submitted suggests that Aeroframe actually condoned ATS's communications with EADS,[154] whether Aeroframe authorized ATS to settle the EADS note without final approval from Aeroframe is disputed.[155] Yet this disputed evidence is immaterial because the plaintiff-employee has presented no evidence that ATS was required to get Aeroframe's authorization to purchase the note. While Aeroframe, Porter, and the plaintiff-employee may not have anticipated the result of the ATS-EADS conversations, their displeasure does not make ATS's actions egregious examples of fraud, deceit, or misrepresentation.

Furthermore, the plaintiff-employee's suggestion that ATS bought the note to sabotage the agreement between Aeroframe and AAR has no evidentiary support. The plaintiff-employee points to evidence that ATS knew Aeroframe was negotiating with another buyer at the time, but this evidence does not suggest that ATS was trying to acquire Aeroframe through fraud, deceit, or misrepresentation.[156] The evidence submitted shows that ATS exercised its business judgment and engaged in a business negotiation.[157] The evidence also suggests that ATS did not know the extent of AAR and Aeroframe's business negotiations.[158] The plaintiff-employee has failed to

---

[153] May NDA (R. # 110-3), pp. 5-8.

[154] *See* Deposition of Cook (R. # 120-5), p. 23. *See also* Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[155] Declaration of Porter (R. #122-3), p. 2, ¶ 8.

[156] Ashford's Memo. in Opposition (R. # 120), p. 5.

[157] *See* Deposition of Cook (R. # 120-5), pp. 26-44.

[158] *See id.*

provide evidence that contradicts this.[159] Accordingly, the plaintiff-employee's LUTPA claims fail substantively.

ATS also argues that the plaintiff-employee's claims fail because he cannot show that ATS's actions caused his damages. The plaintiff-employee asserts that ATS's breach of the November NDA and purchase of the EADS note led to his unemployment, suggesting that if ATS had not purchased the EADS note, AAR would have purchased Aeroframe and if AAR had purchased Aeroframe, AAR would have employed and paid the Aeroframe employees. The plaintiff-employee offers no evidentiary support for the contention that AAR intended to employ and pay back wages for Aeroframe's employees, and this court is unwilling to make such a speculation. As previously discussed, ATS has provided evidence that indicates that Aeroframe's closure and lack of capital was caused by unpaid invoices, not by ATS's actions.[160] For all of the above reasons, the court will dismiss the plaintiff-employee's LUTPA claims, and all other claims, against ATS with prejudice.

### B. Aeroframe's Claims Against ATS

Aeroframe alleges four causes of action against ATS: (1) breach of contract, alleging that ATS breached the November NDA; (2) tortious interference with business relations, alleging that ATS maliciously interfered with Aeroframe and AAR's business relations; (3) intentional interference with contractual relations, alleging that ATS intentionally prevented Aeroframe from contracting with AAR; and (4) unfair trade practices under LUTPA, alleging that ATS engaged in unfair trade practices by purchasing the EADS note without permission. Aeroframe alleges that ATS's actions caused the AAR-Aeroframe potential purchase to fail and, ergo,

---

[159] *See Monroe*, 16-214, p. 10; 207 So. 3d at 1180 (citing *Creative Risk Controls, Inc.*, 01–1150; 847 So.2d at 24).

[160] *See* Porter's Interrogatory Responses (R. # 110-5), pp. 29-30.

caused Aeroframe to cease operations, run out of capital, and be unable to pay its employees. All of Aeroframe's claims fail under the summary judgment standard.

### 1. Waiver Under the Strict Foreclosure Agreement

First, ATS argues that all of Aeroframe's claims must be dismissed because Aeroframe waived them when it signed the strict foreclosure agreement with ATS on August 20, 2013. [161] Under Louisiana law, contracts have the effect of law between the parties and can only be cancelled "through the consent of the parties or on grounds provided by law." [162] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." [163] The strict foreclosure agreement contains a clause in which Aeroframe agreed to "irrevocably and unconditionally release[] and forever discharge[] ATS...from any and all rights, claims, remedies, and causes of action relating to the Note, Security Agreement, and Note Purchase Agreement, and the transfer of the Transferred Collateral under this Agreement." [164] Under the clear meaning of this clause, Aeroframe has waived all claims that arise out of the purchase of or foreclosure on the EADS note. Aeroframe does not contest that this waiver covers all of the claims it has brought against ATS. [165] Rather, Aeroframe argues that the waiver has no effect because the strict foreclosure agreement was signed under economic duress. [166]

Duress is an affirmative defense under Louisiana law and as such, must be affirmatively pleaded under both the Louisiana Rules of Civil Procedure and the Federal Rules of Civil

---

[161] *See* Strict Foreclosure Agreement (R. # 110-3), pp. 54-55, ¶ 8.

[162] La. Civ. Code art. 1983.

[163] *Id.* art. 2046.

[164] Strict Foreclosure Agreement (R. # 110-3), pp. 50-59, ¶ 8.

[165] *See* Aeroframe's Memo. in Opposition (R. # 123), pp. 15-17.

[166] *Id.*

Procedure.[167] "When an affirmative defense is not included in the answer, evidence can be adduced thereon only in the absence of an objection."[168] Aeroframe did not raise the affirmative defense of duress in its pleadings.[169] Because ATS has objected to Aeroframe's affirmative defense,[170] evidence of duress is not properly before the court on a motion for summary judgment.[171] Aeroframe has not moved to amend its pleadings, but if it did so under Rule 15(a)(2) of the Federal Rules of Civil Procedure, the court would grant the request freely if justice so required. Here, any amendment would be futile because the affirmative defense has no merit.

Aeroframe has not presented evidence that the agreement was signed under duress. Under Louisiana law, a contract signed under duress may destroy the consent of the party and make the contract voidable at the victim's option.[172] To make the contract voidable, the duress must be "of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation."[173] "A threat of doing a lawful act or a threat of exercising a right does not constitute duress."[174] Additionally, making an agreement while under dire financial straits does not automatically constitute duress.[175] Aeroframe cites the Louisiana Supreme Court case

---

[167] La. Code Civ. Proc. art. 1005; Fed. R. Civ. P. 8(c).

[168] Brightway Signs, Inc. v. Sharkey, 457 So. 2d 758, 759 (La. App. 1 Cir. 1984) (citing La. Code Civ. Proc. Art. 1005; Red Barn Chemicals, Inc. v. Lassalle, 350 So. 2d 1315, 1317 (La. App. 3 Cir. 1977); Webster v. Rushing, 316 So. 2d 111, 114–15 (La. 1975)).

[169] *See* Answer to Original Petition, Answer to Cross-Claim (R. # 1-1), pp. 116-29.

[170] Reply to Aeroframe and Porter (R. # 129), p. 10.

[171] *See Brightway Signs, Inc.*, 457 So. 2d at 759 (citing La. Code Civ. Proc. Art. 1005; *Red Barn Chemicals, Inc.*, 350 So. 2d at 1317; *Webster*, 316 So. 2d at 114–15).

[172] La. Civ. Code art. 1959 & cmt. d.

[173] *Id.* art. 1959.

[174] *Id.* art. 1962.

[175] Pellerin Const., Inc. v. Witco Corp., 169 F. Supp. 2d 568, 579 (E.D. La. 2001) (citing Aubert v. Entergy Corp., 00-30, p. 5 (La. App. 5 Cir. 5/30/00), 762 So. 2d 288, 291; Hoover v. Boucvalt, 99-0867, p. 6 (La. App. 4 Cir.

*Wolf v. Louisiana State Racing Commission* to support its assertion that unfair bargaining power in an agreement can be considered duress under Louisiana law.[176] However, the court in *Wolf* plainly stated that the threat of doing a lawful act is not duress and only concluded that the contract at issue was signed under duress after determining that the defendant threatened to take action that it had no authority to do.[177]

The present case is easily distinguished from *Wolf*. Because ATS was the owner of the note, it had a legal right to foreclose on the property secured by the note. ATS's threat of enforcing its legal right to foreclose cannot constitute duress under Louisiana law.[178] The fact that Aeroframe was in a dire financial situation after it voluntarily vacated its lease and ceased operations does not vitiate its consent to the strict foreclosure agreement.[179] Aeroframe also affirmatively agreed in the strict foreclosure agreement that it was not signing the document under duress.[180] For these reasons, Aeroframe did not sign the strict foreclosure agreement under duress, and the waiver is effective. Aeroframe has waived all of its claims arising from the EADS note. Because all of its causes of action arise from the purchase of and foreclosure on the EADS note, Aeroframe has waived all of its claims. Consequently, all of Aeroframe's claims will be dismissed with prejudice.

---

11/24/99), 747 So. 2d 1227, 1231; Averette v. Indus. Concepts, Inc., 95-1286 (La. App. 1 Cir. 4/30/96), 673 So. 2d 642, 644; Utley–James of La., Inc. v. Louisiana Dept. of Facility Planning & Control, 593 So. 2d 1261, 1268 (La. App. 1 Cir. 1991)).

[176] Aeroframe's Memo. in Opposition (R. # 123), p. 16 (citing Wolf v. La. State Racing Comm'n, 545 So. 2d 976, 981 (La. 1989)).

[177] 545 So. 2d at 980.

[178] *See* La. Civ. Code art. 1962.

[179] *See Pellerin Const., Inc.*, 169 F. Supp. 2d at 579 (citations omitted).

[180] Strict Foreclosure Agreement (R. # 110-3), pp. 50-59, ¶ 6(g).

## 2. Breach of Contract

Even if Aeroframe had not waived its claims against ATS, Aeroframe's claims would be dismissed under the summary judgment standard because Aeroframe has failed to provide evidence of a genuine issue of material fact. To support its breach of contract claim, Aeroframe alleges that ATS breached the November NDA and the Exclusivity Agreement by using confidential information to purchase the EADS note without Aeroframe's consent.[181] Aeroframe argues that as a result, it was forced to cease operations.[182] As previously explained, the court has determined based on a plain reading of the November NDA, the May NDA, and the Exclusivity Agreement, that the May NDA governed the parties' negotiations in July 2013.[183] Under the Exclusivity Agreement and its integration of the May NDA, ATS had no affirmative duty regarding confidential financial information.[184] Therefore, even if ATS used confidential financial information to purchase the EADS note, it did not breach a contract with Aeroframe by doing so.

Additionally, Aeroframe has failed to submit evidence which supports its contention that ATS's purchase of and foreclosure on the EADS note caused it to cease operations. Aeroframe references Porter's responses to interrogatories and affidavit to support its causal connection.[185] In these documents, Porter explains that Aeroframe ceased operations because AAR was no longer interested in purchasing Aeroframe's assets after ATS purchased the note and because

---

[181] Aeroframe's Memo. in Opposition (R. # 123), p. 5.

[182] *Id.*

[183] *See* November NDA (R. 110-3), pp. 10-12; Exclusivity Agreement (R. # 110-3), pp. 61-62; May NDA (R. # 110-3), pp. 5-8.

[184] *See* Exclusivity Agreement (R. # 110-3), pp. 61-62; May NDA (R. # 110-3), pp. 5-8.

[185] Aeroframe's Memo. in Opposition (R. # 123), p. 5 (citing (R. # 108-7), p. 31; (R. # 108-8), pp. 28, 32 ¶¶ 7, 15). Aeroframe refers to the document numbers in the Motion for Leave to File Excess Pages (R. # 108). The documents correspond to the subsequently filed Motion for Summary Judgment (R. # 110).

Aeroframe was unable to get a loan when AAR did not force Aeroframe's customers pay a past due bill.[186] Aeroframe's causal link is too attenuated. For the purchase of the EADS note to have caused its damages, Aeroframe must provide evidence that AAR would have been able to extinguish the note with EADS for $1.25 million, and that once it acquired Aeroframe, AAR would pay back wages for Aeroframe's employees or that Aeroframe would somehow be able to acquire a payroll loan if the deal with AAR came to fruition. Aeroframe has not done so.

Aeroframe has also failed to provide evidence showing that ATS's foreclosure on the EADS note caused its damages. While Porter states that Aeroframe ceased its operations in part because of an eminently expected foreclosure,[187] Aeroframe has not provided evidence that it would have been able to continue operations or secure a payroll loan had ATS not foreclosed on the note. At the time ATS foreclosed on the note, Aeroframe had been in default for over two years,[188] which means that EADS could have foreclosed on the note, or if EADS had sold the note on the open market, the new purchaser could have foreclosed on the note. Moreover, the timeline does not support a causal connection. Aeroframe made the decision to voluntarily surrender the hangar lease without compensation, cease operations, and not pay its employees before ATS demanded the entire amount due under the note.[189] In fact, ATS's foreclosure on the

---

[186] Porter's Interrogatory Responses (R. # 110-5), p. 31; Affidavit of Porter (R. # 110-6), pp. 28, 32 ¶¶ 7, 15.

[187] Declaration of Porter (R. # 122-3), p. 4, ¶ 32.

[188] Strict Foreclosure Agreement (R. # 110-3), p. 50, ¶ D.

[189] Aeroframe voluntarily surrendered the hangar lease on August 3. Affidavit of Porter (R. #110-6), p. 30, ¶ 12. ATS's initial demand letter was sent on August 6, two days after Porter informed ATS that Aeroframe's assets would be removed from the hangar in two weeks. See Email from Porter (R. # 110-7), p. 12; Demand Letter (R. # 110-7), pp. 2-3. The initial demand letter gave Aeroframe five days to cure the default, and if the default wasn't cured the entire debt would be accelerated and immediately due. Demand Letter (R. # 110-7), pp. 2-3. On August 9, before the five day deadline expired, Porter decided to cease business operations and not pay Aeroframe's employees. Porter's Interrogatory Response (R. # 11-5), pp. 29-30. On August 15, six days after Aeroframe ceased operations, ATS sent another demand letter for the entire amount due under the loan. Acceleration Demand Letter (R. #110-7), pp. 9-10. ATS and Aeroframe did not reach a foreclosure agreement until August 20, sixteen days after ATS was informed that the assets would be removed from the hangar and eleven days after Aeroframe ceased operations. Strict Foreclosure Agreement (R. # 110-3), pp. 50-59.

note took place after the communicated deadline to remove all of Aeroframe's assets had passed.[190] Without evidence of causation, Aeroframe cannot survive a motion for summary judgment. Aeroframe's breach of contract claims will be dismissed with prejudice.

### 3. Tortious Interference with Business Relations

Next, Aeroframe alleges that by purchasing the EADS note, ATS interfered with its business relations and caused AAR not to deal with Aeroframe. Louisiana recognizes a cause of action for tortious interference with business.[191] "Louisiana law protects the businessman from malicious and wanton interference, permitting only interferences designed to protect a legitimate interest of the actor. The plaintiff in a tortious interference with business suit must show…that the defendant improperly influenced others not to deal with the plaintiff." [192] "It is not enough to [show] that a defendant's actions affected plaintiff's business interests; the plaintiff must [show] that the defendant actually prevented the plaintiff from dealing with a third party."[193] Generally tortious interference with business relations claims are viewed with disfavor, and to survive a motion for summary judgment, the plaintiff must present evidence that the defendant acted with malice.[194] "Although its meaning is not perfectly clear, the malice element seems to require a

---

[190] On August 4, ATS was informed by Porter that all assets needed to be removed from the hangar in two weeks, which would have been by August 18. Email from Porter (R. # 110-7), p. 12. While a subsequent agreement between Aeroframe and AAR gave Aeroframe until the end of August to vacate the hangar, no submitted evidence suggests that ATS knew about this arrangement. Affidavit of Porter (R. #110-6), p. 31, ¶ 13. Also, on August 14, AAR sent ATS a letter informing it that it must make immediate arrangements to remove assets. Letter from AAR (R. # 110-7), pp. 5-7. ATS did not acquire Aeroframe's assets pursuant to the strict foreclosure agreement until August 20. Strict Foreclosure Agreement (R. # 110-3), pp. 50-59.

[191] Henderson v. Bailey Bark Materials, 47,946, p. 8 (La. App. 2 Cir. 4/10/13), 116 So. 3d 30, 37 (citing Junior Money Bags, Ltd. v. Segal, 970 F.2d 1, 10 (5th Cir. 1992); Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594 (5th Cir. 1981); Bogues v. Louisiana Energy Consultants, Inc., 46,434, p. 11 (La. App. 2d Cir. 8/10/11), 71 So. 3d 1128, 1134).

[192] Id. (citing Junior Money Bags, Ltd, 970 F.2d at 10).

[193] Id. (citing Bogues, 46,434, pp. 11-12; 71 So. 3d at 1135).

[194] Id. (citing Bogues, 46,434, pp. 11-12; 71 So. 3d at 1135).

showing of spite or ill will, which is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings."[195]

In order to prevail, Aeroframe must show that ATS actually prevented it from dealing with AAR and that it did so with malice. ATS argues that Aeroframe failed to present evidence that ATS's actions caused Aeroframe to be unable to deal with AAR and that Aeroframe has failed to present evidence that ATS acted with actual malice. Aeroframe argues that the evidence shows that ATS's corporate officers knowingly broke contracts by purchasing the EADS note, that ATS had no business purpose in purchasing the note except to exclude AAR from the Chennault Airport, and that ATS's actions prevented Aeroframe from selling its assets to AAR.[196] Aeroframe's arguments fail.

First, as explained above, ATS did not breach a contract with Aeroframe. Furthermore, ATS's actions did not actually prevent Aeroframe from dealing with AAR. While ATS's ownership of the EADS debt essentially gave it ownership over Aeroframe's assets, ATS's purchase of the debt only changed who owned the debt. Before the purchase AAR and Aeroframe would have needed to settle the EADS debt with EADS, and after ATS's purchase, AAR and Aeroframe could have still settled the EADS debt with the debt's new owner. Aeroframe could have still required this as a condition of securing the hangar lease. However, Aeroframe did not do so. Furthermore, AAR and Aeroframe actually dealt with each other after ATS purchased the note. Aeroframe voluntarily surrendered its lease to AAR while asking for nothing in return for itself as an entity.[197] Therefore, because the evidence does not show that

---

[195] *Bogues*, 46,434, p. 12; 71 So. 3d at 1135 (quoting JCD Mktg. Co. v. Bass Hotels and Resorts, Inc., 01–1096, p. 11 (La. App. 4th Cir. 3/6/02), 812 So. 2d 834, 841).

[196] Aeroframe's Memo. in Opposition (R. # 123), pp. 14-15.

[197] By surrendering the lease and recommending AAR for the lease, Porter, as an individual, was able to secure an employment contract, but Aeroframe seemingly secured nothing in return.

ATS actually prevented Aeroframe from dealing with AAR, Aeroframe's tortious interference with business relations claim will be dismissed with prejudice.[198]

Moreover, even if Aeroframe had submitted evidence supporting its allegations that ATS prevented it from dealing with AAR, it has not provided evidence that ATS acted with actual malice. While Aeroframe has pulled misleading quotes to support its allegation that ATS had no reason to purchase the EADS debt,[199] the actual evidence when viewed in context shows that ATS had business reasons to purchase the debt. As previously explained, a method of settling the EADS debt and purchasing Aeroframe's assets lien-free was to purchase the EADS note and foreclose on it. Based on the testimony of ATS's CFO, ATS wanted to run an airplane maintenance and repair operation at the Chennault Airport by purchasing Aeroframe's assets and obtaining the hangar lease.[200] The evidence provided shows that by purchasing the EADS note and laying the groundwork for its foreclosure, ATS was driven by business reasons.[201] This is reinforced by the fact that ATS continued to reach out to Aeroframe, Porter, and the Chennault Airport to secure the hangar lease.[202] Because Aeroframe has failed to provide evidence of malice and the evidence presented shows that ATS acted based on business relations, Aeroframe's tortious interference with business relations claim fails.

The claim also fails because, as explained above in the court's analysis of Aeroframe's breach of contract claim, Aeroframe has not presented evidence that ATS's purchase of or

---

[198] *See Henderson*, 47,946, p. 8; 16 So. 3d at 37 (citing *Bogues*, 46,434, pp. 11-12; 71 So. 3d at 1135).

[199] Aeroframe's Memo. in Opposition (R. # 123), p. 12 (extracting excerpts of evidence in which ATS stated that the EADS note was unwanted, under-collateralized debt and that Aeroframe's assets were valueless without the hangar lease).

[200] *See* Deposition of Cook (R. # 120-5).

[201] *See* Deposition of Cook (R. # 120-5), p. 61.

[202] *See* Email from COO of ATS (R. # 122-8), p. 34; Text Exchange (R. # 122-7), pp. 83-84.

foreclosure on the EADS note caused Aeroframe's damages. For these reasons, Aeroframe's tortious interference with business relations claim will be dismissed with prejudice.

### 4. Intentional Interference with Contractual Relations

Based on the same actions, Aeroframe also alleges that ATS committed the tort of intentional interference with contractual relations. As explained above to survive a motion for summary judgment on this claim, Aeroframe must provide evidence that a corporate officer defendant breached a "duty to refrain from intentional and unjustified interference with the contractual relation between his employer and [Aeroframe]," and Aeroframe was damaged because of this breach.[203] ATS argues that Aeroframe's claim impermissibly expands the scope of this tort by trying to state claim against a corporate entity and that the evidence does not show that ATS's purchase of or foreclosure on the EADS note caused Aeroframe's damages. The court agrees.

As previously explained, this claim fails because the Louisiana Supreme Court has only recognized this cause of action against a corporate officer, not a corporate entity.[204] Additionally, even if such a claim could be sustained under Louisiana law, Aeroframe has failed to provide evidence that ATS's actions caused Aeroframe to be unable to deal with AAR or pay its employees. Aeroframe argues in a conclusory manner that ATS's actions caused its damage, but as previously explained, Aeroframe's causal link is too attenuated. Aeroframe has not presented evidence that ATS's purchase of or foreclosure on the note caused Aeroframe to be unable to deal with AAR, to cease operations, and to be unable to pay its employees. For these reasons, the

---

[203] *9 to 5 Fashions, Inc.*, 538 So. 2d at 234.

[204] *Total Safety*, 2014 WL 6485641, at *4 (declining to extend the cause of action beyond corporate officers and citing various federal cases applying Louisiana law).

court will dismiss Aeroframe's intentional interference with contractual relations claim with prejudice.

## 5. LUTPA

The final claim raised by Aeroframe is an unfair trade practices claim under LUTPA. As described above, to survive a motion for summary judgment, Aeroframe must provide evidence that ATS's actions were egregiously unfair, "offend[ed] established public policy and [were] immoral, unethical, oppressive, unscrupulous, or substantially injurious."[205] Aeroframe must provide evidence that ATS's actions were beyond a simple breach of contract or an allowable business judgment calculated to maximize ATS's profits.[206] Aeroframe must provide evidence that ATS's actions were intended to harm Aeroframe.[207] ATS argues that Aeroframe has failed to meet this burden because ATS's actions were not unfair business practices and ATS's actions did not cause Aeroframe's damages.

Similar to the plaintiff-employee, Aeroframe argues that ATS's actions rise to the level of unfair trade practices because ATS breached the November NDA, the parties never agreed to have the note purchased, and ATS purposefully sabotaged Aeroframe and AAR's negotiations. Aeroframe fails to provide evidence to support its claims. First, as previously discussed, the May NDA governed the parties' negotiations in July, not the November NDA, and therefore, ATS did not violate a nondisclosure agreement by negotiating with EADS. Furthermore, a simple breach of the NDA would not rise to the level of a LUTPA claim.[208]

---

[205] *Cheramie Servs., Inc.*, 09–1633, pp. 10-11, 12; 35 So. 3d at 1059-60 (citing various Louisiana cases).

[206] *Id.* 09-1633, p. 11; 35 So. 3d at 1059 (citing *Turner*, 989 F.2d at 1422).

[207] *See Monroe*, 16-214, p. 10; 207 So. 3d at 1180 (citing *Creative Risk Controls, Inc.*, 01–1150; 847 So.2d at 24).

[208] *Cheramie Servs., Inc.*, 09–1633, pp. 11-12; 35 So. 3d at 1059.

Second, as previously explained, the court considers purchasing the note as one way to settle the note, and Aeroframe has provided no evidence that the parties agreed on a different method to settle the note. The only evidence that elucidates what the parties meant when they discussed settling the note is testimony that ATS would purchase the note from EADS to indirectly purchase Aeroframe's assets.[209] Aeroframe's only evidence to contradict this is a declaration from Porter stating that the debt was to be settled, but Porter does not explain how the parties intended to do that.[210] This declaration does not contradict the evidence provided by ATS, and Aeroframe cannot carry its burden on summary judgment by arguing that this semantic distinction creates a material dispute.[211] And even if the parties agreed to settle the debt in a different manner, ATS's actions would not rise to the level of prohibited LUTPA actions because Aeroframe has not presented evidence that ATS purchased the EADS note to sabotage the Aeroframe.

Aeroframe has attempted to prove that ATS intended to spite Aeroframe by pulling snippets of depositions and haphazardly splicing them together. When viewed in context, the evidence presented does not suggest that ATS wanted to spend $1.375 million on a note so that Aeroframe would not be able to sell itself to AAR. The evidence presented does not suggest that ATS offered to pay $1.375 million because it was the exact midpoint between the amount in AAR's letter of intent and the amount EADS initially wanted for the note. The evidence provided indicates that ATS negotiated at an arms-length with EADS and that ATS wanted to reach a deal quickly to avoid the note going on the open market.[212] The evidence shows that ATS

---

[209] Deposition of Cook (R. # 120-5), p. 23. *See also* Email from Aeroframe's Counsel (R. # 110-4), p. 25.

[210] Declaration of Porter (R. # 122-3), p. 2, ¶ 8.

[211] *See Anderson*, 477 U.S. at 249–50.

[212] *See* Deposition of Cook (R. # 120-5), pp. 24-40.

was actively interested in operating a maintenance and repair facility at the Chennault Airport.[213] Because it has not presented evidence to suggest otherwise, Aeroframe has failed to show a genuine dispute of material fact regarding whether ATS's actions were unfair trade practices.

Finally, similar to its other claims, Aeroframe has failed to present evidence that ATS's alleged unfair trade practices caused it to shut down without capital. As previously described, the causal link between ATS's actions and Aeroframe's damages is too attenuated to sustain a cause of action. For all of the above reasons, the court will dismiss Aeroframe's LUTPA claims against ATS with prejudice.

### C. Porter's Claims Against ATS

Porter alleges that ATS is liable to him for his damages in not securing employment with AAR under three theories—tortious interference with business relations, intentional interference with contractual relations, and unfair business practices under LUTPA.[214] All of Porter's claims are based on ATS's alleged breach of contract when it bought the EADS note. None of the claims survive the summary judgment standard.

### 1. Tortious Interference with Business Relations

Porter alleges that ATS interfered with the business relations between himself and AAR by purchasing and foreclosing on the EADS note. As previously explained, for Porter to survive a motion for summary judgment on his tortious interference with business relations claim, he must provide evidence that ATS kept him from actually dealing with AAR and that ATS was motivated by actual malice and not business reasons.[215] ATS argues that Porter has failed to support a viable claim because (1) AAR continued to deal with him after ATS purchased and

---

[213] *See, e.g.,* Email from COO of ATS (R. # 122-8), p. 34.

[214] *See* Porter's Answer and Incidental Demand (R. # 1-1), pp. 148-58.

[215] *Henderson*, 47,946, p. 8; 16 So. 3d at 37 (citing *Bogues*, 46,434, pp. 11-12; 71 So. 3d at 1135).

foreclosed on the note, (2) ATS was motivated by business reasons, and (3) Porter has not provided evidence of a causal connection between ATS's actions and his harm. Porter does not address his tort of interference with business relations in his opposition.[216]

The evidence provided by ATS shows that AAR continued to deal with Porter because it offered him an employment agreement after ATS bought the note,[217] and therefore, Porter was not "actually prevented...from dealing with a third party."[218] As previously explained in the court's analysis of Aeroframe's interference with business relations claims, the evidence also shows that ATS purchased the EADS note for business reasons, not out of malice. Additionally, Porter has not presented evidence which would show a causal connection between ATS purchasing or foreclosing on the EADS note and AAR's decision not to employ Porter. The evidence provided indicates that AAR refused to employ Porter "until he fully wrapped up with his obligations with Aeroframe" because he failed to pay his employees and blamed his failure on his customers.[219] Accordingly, Porter's tortious interference with business relations claim will be dismissed with prejudice.

## 2. Intentional Interference with Contractual Relations

Next, Porter asserts that ATS intentionally interfered with contractual relations, entitling him to damages. To survive a motion for summary judgment on this claim, as previously explained, he must provide evidence that a corporate officer defendant breached "duty to refrain from intentional and unjustified interference with the contractual relation between his employer

---

[216] Porter's Memo. in Opposition (R. # 122).

[217] *See* AAR Offer of Employment (R. # 110-6), pp. 41-42.

[218] *Henderson*, 47,946, p. 8; 16 So. 3d at 37 (citing *Junior Money Bags, Ltd*, 970 F.2d at 10).

[219] Emails from AAR (R. # 110-7), p. 24.

and [Porter]," [220] and when the corporation breached its contract with him, Porter was damaged.[221] ATS argues that Porter's claim impermissibly expands the scope of this tort by bringing it against a corporate entity and that the evidence does not show that ATS's purchase or foreclosure of the EADS note caused Porter's damages.

The court agrees that Porter's claim could only survive by expanding Louisiana tort law, and this court declines to do so. As previously explained, the Louisiana Supreme Court has only recognized this cause of action against a corporate officer, not a corporate entity.[222] While Porter argues that corporations are often vicariously liable under the doctrine of *respondeat superior*,[223] to do so here would change the entire structure of the tort as established by the Louisiana Supreme Court. As another federal district court noted, "a corporate entity is not liable through *respondeat superior* for [intentional interference with contractual relations] claims asserted against a corporate officer because, by definition, [this] claim involves conduct beyond the scope of the officer's corporate authority."[224] This court agrees. An intentional interference with contractual relations claim cannot be sustained against a corporate entity under a theory of *respondeat superior*. Therefore, Porter's claim will be dismissed with prejudice.

The court would also dismiss the claim with prejudice because Porter has failed to provide evidence of the causal connection between ATS's actions and Porter's damages. As explained in the previous section, Porter does not articulate how the purchase of or foreclosure on a note caused AAR to not employ him. The evidence provided indicates that AAR offered

---

[220] *9 to 5 Fashions, Inc.*, 538 So. 2d at 234.

[221] *Total Safety*, 2014 WL 6485641, at *4.

[222] *Total Safety*, 2014 WL 6485641, at *4 (declining to extend the cause of action beyond corporate officers and citing various federal cases applying Louisiana law).

[223] Porter's Memo. in Opposition (R. # 122), p. 19.

[224] *Bollinger*, 2003 WL 1824836, at *2.

him employment after ATS purchased the note and that AAR had independent reasons for its decision not to employ Porter.[225] With no evidence of a genuine issue of material fact regarding causation, Porter's intentional interference with contractual relations claim will be dismissed with prejudice.

### 3. LUTPA

The final claim raised by Porter is an unfair trade practices claim brought under LUTPA. As described above, for this claim Porter must provide evidence that ATS's actions were egregiously unfair, "offend[ed] established public policy and [were] immoral, unethical, oppressive, unscrupulous, or substantially injurious."[226] Porter must provide evidence that ATS's actions were intended to harm Porter[227] and were beyond a simple breach of contract or an allowable business judgment calculated to maximize ATS's profits.[228] ATS argues that Aeroframe has failed to meet this burden because ATS's actions were not unfair business practices and they did not cause Porter's damages.

Similar to the other plaintiffs, Porter argues that ATS's actions are unfair trade practices because ATS breached the NDA, the parties never agreed to have the note purchased, and ATS purposefully sabotaged Aeroframe's and AAR's negotiations. Porter also fails to provide evidence to support his claims. First, as previously discussed, the May NDA governed the parties' negotiations in July, not the November NDA. ATS did not violate a nondisclosure

---

[225] AAR Offer of Employment (R. # 110-6), pp. 41-42; Emails from AAR (R. # 110-7), p. 24.

[226] *Cheramie Servs., Inc.*, 09–1633, pp. 10-11, 12; 35 So. 3d at 1059-60 (citing various Louisiana cases).

[227] *See Monroe*, 16-214, p. 10; 207 So. 3d at 1180 (citing *Creative Risk Controls, Inc.*, 01–1150; 847 So.2d at 24).

[228] *Cheramie Servs., Inc.*, 09–1633, p. 11; 35 So. 3d at 1059 (citing *Turner*, 989 F.2d at 1422).

agreement by negotiating with EADS. Furthermore, a simple breach of contract claim does not rise to the level of a LUTPA claim.[229]

Second, as previously explained, the court considers purchasing the note as one way to settle the note, and Aeroframe has provided no evidence that the parties agreed on a different method to settle the note. Porter's declaration stating that the debt was to be settled does not contradict the deposition of the CFO, because Porter does not explain a different way in which the parties intended to settle the debt.[230] Porter cannot carry his burden on summary judgment based on this declaration.[231] And even if the parties agreed to settle the debt in a different manner, ATS's actions would not rise to the level prohibited by LUTPA because Porter has not shown that ATS intended to sabotage Porter's deal by purchasing or foreclosing on the EADS note.

Porter's recounting of the timeline does not create a genuine issue of material fact regarding ATS's conduct. While Porter has cushioned the timeline with implications that ATS was driven by a desire to harm Aeroframe, these implications are not supported by the evidence.[232] The evidence shows that ATS pursued the purchase of the EADS note for business reasons,[233] and that ATS only foreclosed on the overdue note after it was informed the note's

---

[229] *See id.*, 09–1633, pp. 11-12; 35 So. 3d at 1059.

[230] Declaration of Porter (R. # 122-3), p. 2, ¶ 8.

[231] *Anderson*, 477 U.S. at 249–50.

[232] For example, Porter argues that "ATS falsely asserts in paragraph F of its Memorandum in Support (that the purchase of the EADs note was 'in furtherance of the contemplated transaction[']) is belied not only by the testimony of Don Cook cited above (the intent was foreclosure) but also the June 23, 2013 email from Don Cook to Roger Porter which outlined in Mr. Cook's own words was the "deal" would be on the EADs note. [sic]" (R. # 122), p. 11. The deposition of Don Cook, ATS's CFO explains how purchasing and foreclosing on the note would allow the company to own the assets lien-free in furtherance of the deal, and the June 23 email from the CFO, explains that "settlement" of the debt would be part of ATS's and Aeroframe's deal.

[233] *See* Deposition of Cook (R. # 120-5).

collateral was to be removed from the hangar.[234] This evidence does not support a LUTPA action which requires an element of fraud, deceit, or misrepresentation.[235]

Finally, the evidence does not show a causal connection between Porter's damages and ATS's actions. While Porter notes that AAR decided to focus on obtaining a direct lease at Chennault Airport after learning that ATS purchased the EADS note,[236] this does not support the contention that if AAR had attempted to go through with the letter of intent that the attempt would be successful or that Porter would be employed by AAR. The evidence shows that AAR extended an offer after the purchase of the EADS note and that AAR did not employ Porter based on reasons independent from ATS's actions.[237] For these reasons, the court will dismiss Porter's LUTPA claims with prejudice.

## IV.   **CONCLUSION**

For the reasons explained above, ATS's Motion for Summary Judgment (R. # 110) will be **GRANTED**, and the plaintiff-employee's claims against ATS will be **DISMISSED WITH PREJUDICE**, Aeroframe's claims against ATS will be **DISMISSED WITH PREJUDICE,** and Porter's claims against ATS will be **DISMISSED WITH PREJUDICE.** The claims will be dismissed at the plaintiffs' costs. The plaintiffs' requests (R. # 120, 122, 123) for oral argument will be **DENIED AS MOOT.**

The Court determines that there is no just reason for delay and will direct entry of final judgment under Rule 54(b) of the Federal Rules of Civil Procedure.

---

[234] *See* Email from Porter (R. # 110-7), p. 12; Letter from AAR (R. # 110-7), pp. 5-7; Strict Foreclosure Agreement (R. # 110-3), pp. 50-59.

[235] *See Cheramie Servs., Inc.*, 09-1633, p. 12; 35 So. 3d at 1060.

[236] Declaration of Porter (R. # 122-3), p. 4, ¶ 27.

[237] Emails from AAR (R. # 110-7), p. 24.

**THUS DONE AND SIGNED** in Alexandria, Louisiana on this 23ʳᵈ Day of May, 2017.

_____
**JAMES T. TRIMBLE, JR.**
**UNITED STATES DISTRICT JUDGE**